UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60159-CIV-COHN/Snow

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

WAYNE ALEXANDER GOPIE, et al.,

      Defendants.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the following motions

1. Defendant Wayne Gopie's Motion to Suppress (DE 96);

2. Defendant Wayne Gopie's Motion to Suppress Post-Arrest Statements (DE 102);

3. Defendant Wayne Gopie's Motion to Suppress Evidence Seized During Search of U-Haul Truck, and the Fruits Thereof (DE 105);

4. Defendant DeShawn Gopie's Motion to Suppress (DE 90), and

5. Defendant Alton Spencer's Motion to Suppress (DE 65), which were referred to United States Magistrate Lurana S. Snow, for report and recommendation.

Each of the defendants is charged by indictment with conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846 (Count 1) and

possession of 100 kilograms or more of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).   Defendant DeShawn Gopie is charged with an additional count of possession with intent to distribute 50-100 kilograms of marijuana (Count 3) and possession of a firearm during and in relation to the commission of a drug trafficking crime (Count 5), in violation of 18 U.S.C. § 924(c).  Defendant Alton A. Spencer is charged in Count 4 with possession with intent to distribute 50 kilograms or more of marijuana. The defendants seek to suppress evidence seized pursuant to the stop and detention of each of them on June 13, 2007, as well as all evidence obtained as the result of each allegedly unlawful stop.   An evidentiary hearing was held on these motions on September 19-20, 2007.

## I. **FACTS PRESENTED**

Special Agent Joseph Fernandez of the Drug Enforcement Administration (DEA) testified that prior to June 13, 2007, he received information from a confidential source that defendant Wayne Gopie was operating a marijuana trafficking organization and was associated with a residence in Florida.  The source also stated that the marijuana was coming from outside the state, and that Wayne Gopie had done time for a narcotics offense.  Agent Fernandez was able to verify that the defendant had a prior drug conviction and that he was connected to two Florida residences, one in Davie and one in Weston.  Wayne Gopie owned the Davie home, while the Weston house was leased in the name of Kirk Gopie.

2

On the morning of June 13, 2007, Agent Fernandez decided to set up a "spot" surveillance at these homes to see what would happen.  Agents who were surveilling the Davie residence reported to Agent Fernandez that they had observed defendants Wayne Gopie, Franco Roper and Branford Myers[1] drive away from the Davie residence in a Jeep Cherokee.  Later that morning, agents watching the Weston home observed Wayne Gopie arrive in a U-Haul truck.  At the same time, Roper and Myers arrived in the Jeep that had been seen earlier in Davie.  Wayne Gopie backed the truck up to the garage door, after which agents observed Gopie, Roper and Myers unloading wooden crates from the truck into the garage.  Two people were required to carry each crate, indicating to the surveillance agents that the crates were heavy.

Agent Fernandez testified that he had begun his DEA career on the Mexican border in Texas, where he had dealt with marijuana smuggling on a daily basis.  Based on his considerable experience, Agent Fernandez believed that the crates contained marijuana, and that the surveillance agents were watching a typical marijuana operation.  The agent noted that the boxes that had been unloaded from the U-Haul into the garage were all the same size. He also stated that the presence of the U-Haul was consistent with the long-distance transport of large items.

---

[1] Surveillance agents recognized Wayne Gopie, of whom they had seen a photograph.  The other two men were identified later.

Surveillance agents next observed the arrival of a BMW, driven by a black female. The female got out of the BMW, entered the Jeep and then drove away from the Weston residence. Another person then drove away in the BMW. An attempt was made to follow the BMW, but it was traveling at a high rate of speed and Agent Fernandez was concerned that anyone who followed the car would be spotted. He called off the surveillance of the BMW and does not know where it went.

The next observation by surveillance agents in Weston was the arrival of defendant Deshawn Gopie in an Infiniti. Deshawn Gopie got out of the car and entered the residence. Shortly thereafter, Wayne Gopie, Deshawn Gopie and Franco Roper began loading large black plastic trash bags into the trunk of the Infiniti. The bags appeared to be heavy. Wayne Gopie and Franco Roper then drove away in the U-Haul, while Deshawn Gopie drove away in the Infiniti. Agent Fernandez ordered some of the surveillance agents to follow both vehicles.

These agents reported to Agent Fernandez that the U-Haul and Infiniti initially had driven in tandem, one behind the other. At a traffic light near a gas station, the vehicles moved next to one another and there appeared to be a conversation among the vehicles' occupants. The two vehicles then split up and were observed engaging in counter surveillance maneuvers. At that point, Agent Fernandez authorized agents to stop both the U-Haul and the Infiniti for investigation.

4

Agent Fernandez testified that defendant Alton Spencer did not come into the picture until after both Gopies and Roper had left the Weston residence. Surveillance agents reported that Spencer had arrived at the residence in a Nissan Altima, walked up to the front of the house, and then returned to the Nissan, talking on a cellular telephone. Shortly thereafter a female arrived at the residence and handed Spencer a set of keys. Spencer then went inside the house and came back out carrying a brown shopping bag with handles.

By that time, Agent Fernandez had learned that marijuana and a firearm had been recovered from the Infiniti and that Deshawn Gopie had marijuana in his pocket. Agent Fernandez decided to stop Spencer's vehicle as well, performing this task himself. Spencer pulled over when Agent Fernandez directed him to do so. The agent got out of his car and identified himself as a law enforcement officer. He told Spencer that he was being detained for questioning and asked for consent to search the Nissan. Spencer agreed, after which Agent Fernandez went directly to the brown shopping bag, which was found to contain marijuana.

On cross examination by counsel for Wayne Gopie, Agent Fernandez acknowledged that a key to the Infiniti had been found inside the Davie residence, owned by Wayne Gopie. The agent also stated that June 13, 2007 was the first day that a "spot check" surveillance had been initiated on the two residences.

5

During questioning by counsel for defendant Deshawn Gopie, Agent Fernandez testified that the Infiniti had arrived at 12:45 p.m. and was parked outside the Weston residence for one hour and twenty minutes, during which time no one had entered the car. In response to questions by Spencer's counsel, the agent stated that he had no prior information on Spencer and that the Nissan had not been seen earlier in the day. Additionally, Spencer had not engaged in counter surveillance maneuvers.

Special Agent Kent Finch of the Bureau of Alcohol, Tobacco and Firearms (ATF), testified that on June 13, 2007, he was on surveillance, positioned directly across the street from the Weston residence. Agent Finch was in a Ford Expedition with tinted windows, and he could not be seen from outside his vehicle. The agent explained that this was the first spot check of the residence and he had not come with the same equipment he might have had for a typical surveillance. He also stated that one of the photographs (Defendants' Exhibit 6) showed the approximate view he had of the residence.

Agent Finch related that he had observed Wayne Gopie and another person arrive in the U-Haul and unload its contents into the garage. The agent was able to view the unloading process, but he could not see inside the garage. After the unloading was completed and the garage door closed, Agent Finch moved his vehicle so he was facing the residence and had a better view of it. He was approximately ninety feet away from the Infiniti when it arrived,

6

and was observing the events at the residence with the aid of binoculars.

Agent Finch stated that when Spencer arrived in the Nissan, he parked in the same place that the agent had used earlier in the day. The agent watched Spencer enter the house through the front door, where he remained for approximately five minutes. When Spencer came out, Spencer was carrying a brown bag with rope handles.

Agent Finch recalled that Spencer exited the house through one of the garage doors. The agent explained that the garage had two doors, and that the crates which had been unloaded from the U-Haul had been taken through one door, while the black plastic trash bags had been brought out through the other door. The agent stated that Spencer brought the brown bag through the same door through which the plastic bags had come. He also testified that throughout the surveillance, he relayed all of his observations via telephone or radio to Deputy Marshal Barry Golden.

United States Deputy Marshal Mark O'Laughlin testified that he had been assigned to follow the Infiniti after it left the Weston residence. He recalled that initially the Infiniti stayed directly behind the U-Haul. When the vehicles separated, the Infiniti made a series of right turns, traveling in a complete square, arriving back to the point where it had separated from the U-Haul. The Infiniti then moved across three lanes into a fourth lane, which was a turn lane, and made a U-turn.

7

Deputy O'Laughlin interpreted these maneuvers as counter surveillance, an effort by the driver to see if police were following him.    The deputy relayed his observations to Agent Fernandez and Deputy Golden, who were in the same vehicle.    These agents made the decision to stop the Infiniti, and relayed that instruction to Deputy O'Laughlin and his partner, Inspector Mehan.

Deputy O'Laughlin pulled the Infiniti over, parking behind it. Another vehicle, driven by DEA Special Agent Eric Rice, had stopped in front of the Infiniti.  Deputy O'Laughlin went to the passenger's side of the vehicle and Inspector Mehan went to the driver's side.

When he reached the Infiniti, Deputy O'Laughlin told the driver, Deshawn Gopie, to put his hands on the wheel.   Instead, Gopie put his hands on his lap.  At that point, Deputy O'Laughlin drew his gun and again told Gopie to put his hands on the wheel. This time, Gopie complied.  Deputy O'Laughlin holstered his gun and came around to the driver's side of the vehicle to assist Inspector Mehan in handcuffing Gopie.  Deputy O'Laughlin explained that Gopie was handcuffed for officer safety, pointing out that he did not know what Gopie had been doing when he put his hands in his lap.[2]

Deputy O'Laughlin testified that he told Deshawn Gopie that he was not yet under arrest.   The deputy recalled that the

_____

[2] In fact, when the defendant got out of the car, his pants were unbuttoned and loose, and a gun was recovered from the floor on the driver's side of the car.

windows of the Infiniti were open and he noticed a strong smell of marijuana. He stated that a gun was visible on the floor on the driver's side of the car. Also, Deshawn Gopie had gallon-sized ziplock bags of marijuana in his pocket, which were plainly visible without the need for any search.

Deputy O'Laughlin related that Agent Rice joined them a short time later. The deputy did not conduct the search of the Infiniti and did not seize anything from it.

On cross examination by counsel for Deshawn Gopie, Deputy O'Laughlin testified that the Infiniti had been stopped while heading northbound on Flamingo Road. He stated that he and Inspector Mehan had waited until Agent Rice had positioned his vehicle in front of the Infiniti before activating their lights and pulling the Infiniti over. Deputy O'Laughlin also stated that it was Inspector Mehan who had ordered Deshawn Gopie to get out of the car.

Deputy O'Laughlin clearly recalled that he had seen the gun on the floor on the driver's side of the Infiniti and was certain that he had not heard Inspector Mehan asking Deshawn Gopie where the gun was. The deputy explained there had been no reason to ask about the gun, since it was plainly visible.

Counsel for Deshawn Gopie then produced a recording of the event that had been made by Gopie's cell phone and preserved as a voice mail message. In that recording, Inspector Mehan asked the defendant if there was a gun that they need to know about. Deshawn

9

Gopie replied that he had a gun in the car, and Inspector Mehan asked several times where it was.

On redirect examination, Deputy O'Laughlin testified that after Deshawn Gopie had been handcuffed, he moved Gopie to a position near the passenger door of the Infiniti. The deputy then removed Gopie's wallet and seated Gopie on the shoulder of the road. Agent Rice then came up to the Infiniti and walked around it, after which Deputy O'Laughlin walked back around the car and observed the gun. Deputy O'Laughlin identified Government's Exhibits 3 and 4 as photographs of the gun as it was found on the floor near the driver's seat and the marijuana later recovered from the trunk of the Infiniti.

DEA Special Agent Eric Rice testified that he had positioned his vehicle in front of the Infiniti, after which the Infiniti was stopped by Deputy O'Laughlin and Inspector Mehan. At first, Agent Rice ducked down in his own vehicle and stayed out of sight, checking periodically to see what was taking place behind him. When he saw Deshawn Gopie get out of the Infiniti, the agent exited his vehicle and approached the Infiniti.

Agent Rice recalled that he asked repeatedly if anyone else was inside the Infiniti, but he received no response. For officer safety reasons, the agent then looked inside the vehicle for other persons. He observed a gun on the floorboard on the driver's side and took a photograph of the gun as he found it

(Government's Exhibit 4).   When he opened the trunk, Agent Rice found plastic bags filled with marijuana.

On cross examination, Agent Rice testified that initially he had been told to follow the U-Haul, but then was instructed to go with the Infiniti.   As the agent rejoined the Infiniti, he saw it make the U-turn on Flamingo.   Agent Rice estimated that 30 seconds had elapsed from the time he began following the U-Haul to the time he rejoined the Infiniti and observed the U-turn.

Also on cross examination, Agent Rice stated that when Deshawn Gopie got out of the Infiniti, the agent could see large bags in his pockets.   Agent Rice explained that he was not the one who had secured the gun, since his primary goal had been to secure the rest of the vehicle to make sure there were no other persons inside.   The agent added that he had yelled his question about whether there was anyone else in the vehicle loud enough for Deshawn Gopie to hear, but Gopie had not replied.   Finally, Agent Rice testified that he could not have relied on surveillance reports that no one other than DeShawn Gopie had entered the Infiniti because he did not know what the agents' vantage points had been.   He stated that the rule he follows is to always assume that there is one more of whatever he is concerned about (people, guns, etc.).

The last witness to testify was DEA Special Agent Kyle Kent.   Agent Kent related that he was one of the agents who had followed the U-Haul and the Infiniti as they drove away from the

11

Weston residence.  When the two vehicles split, Agent Kent stayed with the U-Haul.  When the decision was made to stop the vehicle, it had turned into a shopping center at the intersection of Flamingo and Griffin Roads.  Since the U-Haul had parked along a curb, Agent Kent did not need to conduct a traffic stop.

Agent Kent approached the U-Haul on the driver's side and asked the driver to step out.  The agent had been advised that the investigation involved marijuana, and he had his gun drawn for safety reasons.  When Agent Kent reached the driver's door, he saw that the driver was about to get out anyway.  As soon as he saw the driver complying with the instruction to step out of the vehicle, Agent Kent holstered his weapon.

The agent then conducted a quick pat-down of the driver, whom he identified as Wayne Gopie.  Agent Kent then took Gopie over to a grassy area next to the curb.  At that time, Gopie was not handcuffed and was not advised that he was under arrest.  Other agents then had Gopie lie down on his stomach so they could conduct a more thorough pat-down search.  Agent Kent told Gopie that he would have to wait for the arrival of the case agents for an explanation of what was going on.

Agent Kent then asked Gopie if he minded if the agent searched the U-Haul.  Gopie told him to go ahead.  At that time, none of the agents had his gun drawn, and Gopie had not been handcuffed.

12

During the search, Agent Kent found in the cab area a receipt for the rental of the U-Haul. He also smelled marijuana in the cargo area and observed some dirt and grime on the floor, which included some green plant-like particles. A K-9 unit was summoned, and the particles ultimately proved to be marijuana residue.

When Agent Kent received the order from Agent Fernandez to arrest Gopie and the passenger (identified as Franco Roper), both men were handcuffed and placed inside a police vehicle. Agent Kent read them their <u>Miranda</u> rights from a DEA card. Wayne Gopie stated that he understood his rights and agreed to answer questions. Agent Kent had not made any threats or promises to Gopie, and Gopie was not impaired in any way. Agent Kent was satisfied that Gopie understood his rights.

On cross examination, Agent Kent acknowledged that Gopie never was told that he was free to leave, since this issue never came up. As far as Agent Kent was concerned, Gopie was not under arrest at the time he gave the agent permission to search the U-Haul. The agent conceded that Gopie was not asked to sign a written consent to search or a written <u>Miranda</u> waiver.

Counsel for Wayne Gopie and the prosecutor stipulated that if the Infiniti salesman from Wayne Henry Automobiles, Inc., were called to testify, he would identify Defendants' Exhibit 9, as the lease documents pertaining to the vehicle involved in the instant case. The salesman also would state that Wayne Gopie made the down payment on the vehicle, signed for it and drove away with

13

it.  Finally, he would testify that it was his understanding that the documents were issued in the name of Joyce Gopie, Wayne Gopie's mother, because she had better credit than her son.

## II. RECOMMENDATIONS OF LAW

Defendants Wayne Gopie, DeShawn Gopie and Alton Spencer each seeks to suppress evidence seized from the vehicle he was driving on the ground that the agents lacked the reasonable suspicion required to justify an investigatory stop of the vehicle. Each defendant argues that any evidence (including evidence seized pursuant to search warrants) obtained after the stop of his vehicle is tainted by the unlawful stop and is inadmissible as "fruit of the poisonous tree."  Wayne Gopie also alleges that his consent to search the U-Haul was not voluntary.

Defendant Wayne Gopie has filed two additional motions to suppress: one arguing that he has standing to challenge evidence seized from the Infiniti driven by his brother DeShawn Gopie, and another seeking to challenge his post-arrest statements based on a Miranda violation.  Based on the testimony presented at the evidentiary hearing, counsel for Wayne Gopie concedes that there was no Miranda violation in connection with his post-arrest statements and, therefore, no grounds to suppress those statements if the stop of his vehicle is found to be lawful.

The parties agree that the legality of the stop is governed by the principles of Terry v. Ohio, 392 U.S. 1 (1968). Under Terry, the duration and scope of a traffic stop must be

14

reasonable in light of the circumstances which justified the stop

in the first place. United States v. Purcell, 236 F.3d 1274, 1277

(11th Cir. 2001), quoting Terry, 392 U.S. at 20.  As summarized in

United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006):

> "[L]aw enforcement officers may detain a
> person briefly for an investigatory stop if
> they have a reasonable, articulable suspicion
> based on objective facts that the person has
> engaged in, or is about to engage in, criminal
> activity. The 'reasonable suspicion' must be
> more than an 'inchoate and unparticularized
> suspicion or hunch.' " United States v.
> Powell, 222 F.3d 913, 917 (11th Cir.2000)
> (citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct.
> 1868, 1883, 20 L.Ed.2d 889 (1968)). Reasonable
> suspicion is determined from the totality of
> circumstances and collective knowledge of the
> officers. United States v. Acosta, 363 F.3d
> 1141, 1145 (11th Cir.2004). "[W]hether
> reasonable suspicion existed at the time [of
> the investigatory stop] is a question of law
> to be determined ultimately by judges, not
> policemen .... [T]he question ... is not
> whether a specific arresting officer ...
> actually and subjectively had the pertinent
> reasonable suspicion, but whether, given the
> circumstances, reasonable suspicion
> objectively existed to justify such a search."
> Hicks v. Moore, 422 F.3d 1246, 1252 (11th
> Cir.2005) (citing Evans v. Stephens, 407 F.3d
> 1272, 1280 n. 9 (11th Cir.2005) (en banc)).

The  Nunez  court  emphasized  that  "'[T]he

determination of reasonable suspicion must be based on commonsense

judgments and inferences about human behavior.'" 455 F.3d at 1227,

quoting Illinois v. Wardlow, 528 U.S. 119 (2000).

The law also is clear that an officer conducting a

traffic stop may take such steps as are reasonably necessary to

protect his personal safety, which include conducting a protective search of the driver, passengers and vehicle; seizing any contraband, including weapons, in plain view; using a flash light to illuminate a vehicle's dark interior, and prolonging the detention in order to investigate the driver's license, vehicle registration and criminal history by means of a computer check. Purcell, 236 F.3d at 1277-78. Additionally, the officer is entitled to ask the driver if there were firearms or narcotics in the vehicle. Id. at 1280.

## A. __Standing to Contest the Stop and Search of the Infiniti__

Both Wayne and DeShawn Gopie challenge the stop and subsequent search of the Infiniti. The Government does not contest the right of DeShawn Gopie, who was driving the vehicle, to seek suppression of evidence obtained as the result of the stop. The Government does assert that Wayne Gopie lacks standing to do so.

Wayne Gopie produced evidence that he had delivered the down payment for the lease of the Infiniti, signed for the car and drove it away. All documents pertaining to the vehicle were in the name of Joyce Gopie, the mother of Wayne and DeShawn Gopie. The salesman who handled the transaction was led to believe that this was done because Mrs. Gopie had better credit than her son Wayne. There also was evidence that a key to the Infiniti was found inside a residence owned by Wayne Gopie.

The undersigned finds that these facts are not sufficient to demonstrate that Wayne Gopie had a reasonable expectation of

16

privacy in the Infiniti at the time it was stopped and searched.
In <u>United States v. Fuller</u>, 374 F.3d 617 (8th Cir. 2004), the
purported owner of a vehicle contested the stop and search of the
vehicle while it was being driven by the owner's stepson. Although
the vehicle was titled in the name of the stepfather wife, the
stepfather made the payments on it, drove it to work and controlled
the keys.

The court found that the stepfather had a substantial
property interest in the vehicle.  However, the stepfather could
not challenge the stop of the vehicle, since the "right to be free
from random, unauthorized investigatory seizures. . . . belongs to
the stepson." <u>Id</u>. at 620.  Regarding the search of the vehicle, the
court reasoned:

> A person who lends an automobile to another of
> course does not give up his or her fourth
> amendment interest altogether. The lender's
> right to possession when the bailment
> terminates, for instance, is a valuable
> property right. On the other hand, the
> lender's right to control the property during
> the bailment is greatly diminished, and he or
> she no longer has a reasonable expectation of
> a possessory interest in it for a time. When
> Mr. Fuller lent the van to his stepson, he
> gave up any significant expectation related to
> controlling its movement. . . . It is
> important to realize that a person's interest
> in his or her loaned effects is not identical
> to the possessory interest of the bailee who
> has direct control of the effects, and the
> lender cannot assert the bailee's independent
> fourth amendment right to have the bailee's
> interest protected from unreasonable
> government interference.

Id. at 621.  The court held that "a brief stop by the police of a loaned automobile being driven by a third party does not significantly impair the interests of the person who lent the automobile," and the stepfather lacked standing to contest the search of his vehicle while it was on loan. Id.

The position of Wayne Gopie with regard to the Infiniti is virtually identical to that of the stepfather/owner in <u>Fuller</u>. Moreover, Wayne Gopie has not cited any case which refutes the reasoning or holding of <u>Fuller</u>. Accordingly, the undersigned finds that Wayne Gopie did not have a reasonable expectation of privacy in the Infiniti at the time of the search and lacks standing to contest the stop and search of that vehicle.

## B. <u>Reasonable Suspicion to Stop the Vehicles</u>

At the time Agent Fernandez ordered the stop of the Infiniti and the U-Haul, he had the following information:

(1) A confidential source had stated that Wayne Gopie was part of an operation involving marijuana from outside the state of Florida, that Gopie had done time for a drug conviction and that Gopie was associated with a residence in Florida.[3]

---

[3] The Government objected to any questions pertaining to the reliability of the confidential source in order to protect the source's identity, and agreed that the information provided by the source should be treated as an anonymous tip for purposes of these motions.

(2) Investigation by DEA had revealed that Wayne Gopie had been convicted of a narcotics offense and was associated with two Florida homes, one in Davie and another in Weston.

(3) A "spot check" of the two residences on the morning of June 13, 2007, revealed that Wayne Gopie, Franco Roper and Branford Myers drove away from the Davie residence in a Jeep Cherokee. Later that morning, Wayne Gopie arrived at the Weston home in a U-Haul truck. At the same time, Roper and Myers arrived in the Jeep Cherokee. Wayne Gopie backed the truck up to the one of two garage doors, after which Gopie, Roper and Myers unloaded wooden crates from the truck into the garage. Two people were required to carry each crate, indicating that the crates were heavy. The crates were all the same size.

(4) Based on his extensive experience investigating marijuana smuggling at the Texas/Mexico border, Agent Fernandez knew that these activities strongly indicated that the individuals were engaged in a marijuana operation.

(5) Later that morning, DeShawn Gopie arrived at the residence in an Infiniti and went inside the house. Shortly thereafter, Wayne Gopie, Deshawn Gopie and Franco Roper came out of the second garage door carrying large black plastic trash bags, which appeared to be heavy. The three men loaded the bags into the trunk of the Infiniti. Wayne Gopie and Franco Roper then drove away in the U-Haul, while Deshawn Gopie drove away in the Infiniti.

(6) The U-Haul and Infiniti initially were driven in tandem, one behind the other.   At a traffic light near a gas station, the vehicles moved next to one another and there appeared to be a conversation among the vehicles' occupants.   The two vehicles then split up and the Infiniti made several right turns before crossing three lanes into a turn lane and making a U-turn. These maneuvers indicated that the driver was engaged in counter surveillance.   The U-Haul drove into a shopping center.

Based on all of these objective facts, there can be no question that Agent Fernandez had a reasonable, articulable suspicion that the persons in the Infiniti and the U-Haul had engaged in, or were about to engage in, criminal activity.   Indeed, Agent Fernandez reasonably suspected that marijuana had been unloaded from the U-Haul, and that some of that marijuana had been transferred to the Infiniti.

DeShawn Gopie argues that this court should disregard as incredible the testimony of Deputy O'Laughlin regarding the counter surveillance maneuvers made by the Infiniti because (1) the deputy had an inaccurate recollection of whether his partner, Inspector Mehan, had asked DeShawn Gopie about a gun and (2) Agent Rice did not observe the counter surveillance maneuvers after having lost sight of the Infiniti for only about thirty seconds.   However, Agent Fernandez testified that he received radio reports of counter surveillance measures before ordering the stop, indicating that the Infiniti's maneuvers had been reported by Deputy O'Laughlin.

20

Moreover, Agent Rice initially followed the U-Haul, and cannot account for all activities of the Infiniti while his attention was focused on another vehicle.   Finally, although Deputy O'Laughlin did not recall hearing Inspector Mehan ask Deshawn Gopie about a gun, it is unlikely that he would be in error about following the Infiniti as it made several right turns and drove in a square.

Based on all the pertinent credibility factors, including manner of testimony, the undersigned finds to be fully credible Deputy O'Laughlin's testimony regarding the path of the Infiniti prior to its stop.   The undersigned further finds that prior to ordering the stop of the Infiniti and the U-Haul, Agent Fernandez knew that the Infiniti had engaged in counter surveillance maneuvers. Accordingly, there is no basis to suppress any evidence seized as the result of the stop of either the Infiniti or the U-Haul.

With regard to the stop of the Nissan driven by Alton Spencer, Agent Fernandez had the following additional information:

1) Marijuana had been found on the person of DeShawn Gopie and in the trunk of his vehicle;

2) Alton Spencer arrived at the Weston residence in a Nissan Altima.   Spencer walked to the door of the house, then went back to his car while talking on a cell phone.   A short time later, a female arrived and handed Spencer a set of keys.

3) Spencer then entered the house, where he remained for approximately five minutes.   Spencer exited the house through the

same garage door from which the plastic bags (now known to contain marijuana) had come.  He was carrying a brown bag with rope handles.

Counsel for Spencer argues that Spencer could have gone to the house for a completely innocent purpose and could have been carrying anything in the paper bag.  However, this possibility does not negate the reasonableness of Agent Fernandez' suspicion that Spencer, like the Gopie brothers and Franco Roper, was engaging in criminal activity.  Under the totality of the circumstances, a brief investigatory stop of Spencer was justified.

## C. Voluntariness of Wayne Gopie's Consent to Search the U-Haul

Finally, Wayne Gopie argues that his consent to search the U-Haul was not voluntarily given, as required by *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  In *Schneckloth*, "the Supreme Court held that the voluntariness-of-consent analysis is conducted with reference to the totality of the circumstances and set forth a number of factors for a court to consider in conducting its inquiry: the person's youth, his lack of education, evidence of the person's low intelligence, the existence of advice as to the nature of the constitutional right implicated, the length of detention preceding the request to consent, the nature of prior questioning, the environment, and whether any physical punishment was involved." *United States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999), citing *Schneckloth*, 412 U.S. at 226.  The Eleventh Circuit has held

22

that to be considered voluntary, a consent to search "must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir.1989).

DEA Special Agent Kyle Kent testified that he approached the U-Haul on the driver's side and asked the Wayne Gopie to step out of the truck. At that time, Agent Kent had drawn his weapon for safety reasons. However, as soon as the agent saw that Gopie was complying with the instruction to step out of the vehicle, he holstered his gun.

The agent then conducted a quick pat-down of Gopie, after which he took Gopie to a grassy area next to the curb. Gopie was not handcuffed and was not advised that he was under arrest. Other agents then had Gopie lie down on his stomach so they could conduct a more thorough pat-down search. Agent Kent told Gopie that he would have to wait for the arrival of the case agents for an explanation of what was going on.

Agent Kent then asked Gopie if he minded if the agent searched the U-Haul. Gopie told him to go ahead. At that time, none of the agents had his gun drawn, and Gopie had not been handcuffed.

Considering the factors listed in <u>Schneckloth</u>, <u>supra</u>, there is no evidence that Wayne Gopie suffers from a lack of education or low intelligence. He had been detained only minutes and had not been questioned. He was not handcuffed and had not been placed under arrest, although he had been patted down for

weapons twice.   No threats had been made and no punishment inflicted.   Gopie had not been told that he had a right to refuse consent and he did not sign a written consent form.

Under the totality of the circumstances, the undersigned finds that Wayne Gopie's consent to search the U-Haul was the product of free and unconstrained choice, and therefore was voluntary.   The evidence seized from the U-Haul, and any evidence obtained as the result of the search of the U-Haul, should not be suppressed based on an invalid consent.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the following motions be DENIED:

1. Defendant Wayne Gopie's Motion to Suppress (DE 96);

2. Defendant Wayne Gopie's Motion to Suppress Post-Arrest Statements (DE 102);

3. Defendant Wayne Gopie's Motion to Suppress Evidence Seized During Search of U-Haul Truck, and the Fruits Thereof (DE 105);

4. Defendant DeShawn Gopie's Motion to Suppress (DE 90), and

5. Defendant Alton Spencer's Motion to Suppress (DE 65).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 26th day of September, 2007.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:
AUSA David Haimes (MIA)
Howard Srebnick, Esq.
Scott Srebnick, Esq.
David Tucker, Esq.
Sidney Fleishman, Esq.
Jose Quinon, Esq.